## ATTACHMENT A
### Statement of Facts

*This Office and the Defendant, **ANATOLY FEDOROVSKY**, agree that if this case proceeded to trial, this Office would prove the facts set forth below beyond a reasonable doubt. They further stipulate and agree that these are not all of the facts that this Office would prove if this case proceeded to trial.*

At all times relevant to the Information, the Defendant, **ANATOLY FEDOROVSKY** (**"FEDOROVSKY"**), was the CEO of Corporation A, a company that dealt in, among other things, software protection, licensing, and security. **FEDOROVSKY** also was a naturalized United States citizen of Ukrainian origin.

Between in or about July 2015, and in or about December 2015, in the District of Maryland and elsewhere, **FEDOROVSKY** entered into contract negotiations with a public official ("CW-1") then working for the Department of Energy ("DOE"), in the hope that CW-1 would find a DOE contract that would be suitable for **FEDOROVSKY** and Corporation 1. Specifically, on or about July 17, 2015, Individual A asked CW-1 to assist **FEDOROVSKY** in getting DOE contracts, and advised CW-1 that **FEDOROVSKY** would contact CW-1;

[Subsequently, on or about August 11, 2015, **FEDOROVSKY** contacted CW-1 by telephone and e-mail to indicate his interest in securing ~~DOE~~ *non-Government software* contracts for Corporation 1.] - AF
Between July and October 2015, **FEDOROVSKY** and Individual A discussed with CW-1 at least one contract suitable for Corporation A. During this time period, CW-1 also introduced **FEDOROVSKY** to an undercover law enforcement officer posing as a DOE contract specialist ("UCE-1").

On or about September 9, 2015 **FEDOROVSKY** met with CW-1 and UCE-1 in Gaithersburg, Maryland, and was provided with information on what **FEDOROVSKY** believed was an available DOE contract for computer services - the so-called "SHAPE" contract. **FEDOROVSKY** ~~suggested to UCE-1~~ *agreed to* several methods that could be used to communicate about contract details outside of official communications. Among other things, **FEDOROVSKY** and UCE-1 discussed the fact that UCE-1 could provide confidential bidding information to **FEDOROVSKY** to assist **FEDOROVSKY** in obtaining the contract.

On or about October 13, 2015, **FEDOROVSKY** e-mailed UCE-1 (at UCE-1's personal e-mail account) a draft bid for the SHAPE contract in the amount of $774,000. **FEDOROVSKY** and UCE-1 then discussed by telephone that the lowest bid on the contract (from an unspecified third-party contractor) was approximately $1,350,000. **FEDOROVSKY** subsequently e-mailed UCE-1 (this time, at UCE-1's official DOE e-mail address) a formal bid on the contract, in the amount of $1,025,000.

On or about October 28, 2015, **FEDOROVSKY** met UCE-1 at a restaurant in Gaithersburg, Maryland. During that meeting, **FEDOROVSKY** and UCE-1 discussed a bribe.

8

The conversation between CW-1 and **FEDOROVSKY** ("**AF**") then proceeded, in relevant part, as follows:

| | |
|---|---|
| AF: | And, uh, well, let's discuss your interest, your - your participation, your involvement. How - how should we - what should we do? |
| UCE-1: | Well, in terms of awarding the contract and after and - ? |
| AF: | Yup. |

\* \* \*

| | |
|---|---|
| AF: | I - I am [unintelligible] you to be [unintelligible], so why - I see it as some - some person and the amount it should be standard probably, you know? |
| UCE: | There's nothing standard. It's an - it's an- it's an agreement, you know. It's not like, I mean, if you've done this in the past, what have you paid in the past? |
| AF: | Uh, maybe five to ten. |
| UCE: | Five to ten? |
| AF: | Yeah. |

\* \* \*

| | |
|---|---|
| AF: | What do you - what do you want? |
| UCE: | So if you say - well, 10% of that would be what? 250 would be $25,000? |
| AF: | No. No. I, uh, I mean, five to ten. Let's say 7% of the total amount. |
| UCE: | Okay, so 7% then of the 200? |
| AF: | That would be almost 70 – |
| UCE: | About 14? |
| AF: | 70K. |

9

In this same conversation, **FEDOROVSKY** also expressed his preference to make payments to UCE-1 through an unrelated third party or company to whom he could send an IRS Form 1099 tax document at the end of the year.

UCE-1 and **FEDOROVSKY** discussed and then agreed that, of the $70,000 total bribe, **FEDOROVSKY** would pay $7,000 in cash up front, on the day of the contract, but before the contract was signed. **FEDOROVSKY** expressed his desire that after the first payment, all future payments would go through a consultant.

On November 17, 2015, **FEDOROVSKY** travelled to Germantown, Maryland, to meet UCE-1 at a restaurant, where **FEDOROVSKY** provided UCE-1 with $7,000 in cash.

Approximately two hours after paying UCE-1, **FEDOROVSKY** entered the DOE Headquarters facility in Germantown, Maryland, and signed what he believed to be a DOE contract - the SHAPE contract - in the amount of $1,025,000, knowing that the conditions of the contract prohibited entering into the contract by means of bribery.

**FEDOROVSKY** agreed to provide the bribe in exchange for CW-1's and UCE-1's favorable treatment in helping Corporation A obtain a DOE contract.

* * *

I have read this statement of facts, and have carefully reviewed it with my attorney. I acknowledge that it is true and correct.

10/31/16
Date

_____
Anatoly Fedorovsky

I am Anatoly Fedorovsky's attorney. I have carefully reviewed every part of this Statement of Facts with him. To my knowledge, his decision to sign it is an informed and voluntary one.

10-31-16.
Date

_____
Albert Dayan, Esq.

10